# Exhibit 2

**Edward C. O'Bryan, M.D., M.B.A., C.P.E.**

**Internal Medicine/Emergency Medicine/Correctional Medicine**

<u>**Independent Expert Review and Report**</u>

<u>**Edwin Thibodeau, as Person Representative of the Estate of Alan R. Thibodeau v. Bamberg County, South Carolina; Southern Health Partners, Inc.; Geri Gillespie, LPN, In Her Individual Capacity; Karen Hughes, LPN, In Her Individual Capacity; Officer Billy Ray Coggins, In His Individual Capacity; Lt. Ashley Woods, In Her Individual Capacity; Cpl. Patrice Hatton, In Her Individual Capacity; And Cpt. Latarcha Wilson, In Her Individual Capacity;**</u>

**C/A No. 6:23-cv-06605-SAL-KFM**

**District of South Carolina**

**7/08/2024**

<u>Background and Experience</u>

I am a physician, licensed by the State of South Carolina and the appropriate regulatory agency having jurisdiction over the practice of my profession in the location in which I practice. I have dual licensing to practice both Internal Medicine and Emergency Medicine by the State of South Carolina. I am Board Certified by the American Board of Internal Medicine, a national association which administers written and/or oral examinations for certification in the area of practice and specialty about which this opinion on the standard of care is offered.

My practice as a physician for the last five years consists of a mixture of clinical direct patient care in the Emergency Department at the Medical University of South Carolina, teaching residents in various specialties (didactics and clinical teaching), clinical care via Telemedicine for primary, urgent and emergency care, academic service as the medical director of the MUSC Physicians Assistant Program, hospital administration as the Chief Medical Officer of MUSC

Business Health, and as the Executive Vice President and Clinical Operations and Vice President of Medical Affairs for Wellpath, Inc. I also serve as an internal consultant on correctional healthcare for MUSC in dealings with the South Carolina Department of Corrections and various detention centers. Specifically in my clinical practice, I primarily see adult patients in the MUSC Level 1 Emergency Department that has two locations with an annual volume of roughly 75,000 patients a year.

I am an Associate Professor of Emergency Medicine and have full, unencumbered academic privileges within the University where I have taught didactics to MDs, PAs, NPs, Medical Students and MHA students. I also work clinically in several telemedicine systems and founded the MUSC Virtual Urgent Care system that has seen over 500,000 patients. I have also started 3 Fellowships at MUSC for PAs and MDs. At MUSC I also currently oversee the MUSC Correctional Health Center for Excellence as the ICCE Chief. This involves direct and administrative care to the roughly 16,000 census South Carolina Department of Corrections. In this capacity, I created the first secure inpatient medical unit in South Carolina for the South Carolina Department of Corrections and MUSC partnership. In addition, my team created the first academic partnership mental health secure unit in the MUSC Lancaster Division.

On the healthcare administration side, I serve on several credentialing, quality, and strategy committees amongst other system-wide duties. On the correctional side, I have worked clinically in correctional settings in a PRN manner for over 12 years. This includes direct patient care, quality oversight, creating clinical pathways, evaluating morbidity and mortality cases, advancing telemedicine solutions, and supervising correctional healthcare staff. From a teaching aspect (beyond my clinical teaching while working clinical shifts), I have taught extensively in the MUSC College of Health Professions Physicians Assistant Program as well as in the College of Medicine MD program. The majority of this teaching is didactic and involves various clinical

and basic science concepts.

At Wellpath, Inc., I led a team of over 5,000 MDs/APPs/PhDs/MSW/DMDs and mental health professionals covering Telehealth and in-person care for over 150,000 patients daily in 37 States (over 70% are under-served and minority). My areas of expertise include clinical and administrative healthcare delivery in correctional, mental health and substance abuse center settings, telehealth, business development, client relations, staffing, technological innovation and implementation, strategic planning, pricing structures, regulatory affairs, quality control, medical affairs, protocol development and lean process implementation.

I have actual professional knowledge and experience in the specialty and area of practice in which my opinions are given as a result of my having been regularly engaged in the active practice in the area of specialty and practice for at least three (3) of the last five (5) years immediately preceding this opinion. My curriculum vitae is attached and referenced for further detail of my education, experience, and practice.

Through my professional standing as set forth above, I am familiar with the applicable standard of care practiced by health care providers practicing internal medicine, as well as those practicing emergency medicine. I am an experienced internal medicine physician and familiar with the applicable standard of care in a clinical setting to evaluate adult patients in an emergency room setting, including patients reported to be suffered from mental health conditions, including severe depression and suicidal ideations. The standard of medical care applicable to adult patients coming from a correctional setting is the same standard of medical care applicable to adult patients reporting to the emergency room from a non-correctional setting.

Fee Structure and Compensation

My compensation to be paid for the study and testimony in this case is at the rate of $400 per hour for review of records and $550 per hour plus expenses for deposition and trial testimony.

<u>Prior Testimony</u>

While I do not keep a formal listing of prior cases I have testified in or cases I have previously reviewed as an expert, I am aware of the following cases I have testified in during the last four (4) years and I believe this list to be complete.

- Smith v. Gadebeku, et al., 2024 – Defense
- Duane Keezer v. USA, 2022 – Defense
- James DeWitt v. USA, 2022 – Defense
- Miller v. AnMed, 2023 – Defense
- Cassiopia Rhodes v. Southern Health Partners, Inc., et al., 2023 – Plaintiff
- Estate of Kevin Gordon v. Florence County, South Carolina, et al., 2022 – Plaintiff
- Estate of Michael Naqshabandi v. Horry County, South Carolina, et al., 2022 – Plaintiff
- Elizabeth Stokes and Stephen Stokes v. McLeod Regional Medical Center, et al., 2021 – Plaintiff

<u>Materials Reviewed</u>

The evidence made available to me for review includes:

    a.  Death certificate of Alan Thibodeau;
    b.  Amended death certificate of Alan Thibodeau;
    c.  Personal Representative Appointment (Virginia);
    d.  Personal Representative Appointment (South Carolina);
    e.  Expert Affidavit of Edward O'Bryan, MD;
    f.  Medical records of Bamberg Barnwell Medical Center;
    g.  Billing records of Bamberg Barnwell Medical Center;
    h.  Medical records of Bon Secours Southside;
    i.  Billing records of Bon Secours Southside;
    j.  Autopsy Report of Alan Thibodeau;
    k.  Discharge records of Southside Medical Center;
    l.  Records of Lexington County Coroner's Office;
    m.  Medical records of Lexington Medical Center;
    n.  Medical records of Medshore Ambulance;
    o.  Billing records of Medshore Ambulance;
    p.  Facesheet of SC Department of Mental Health;

q.  Medical records of Southern Health Partners, Inc.;
r.  FOIA Response of Bamberg County Sheriff's Office;
s.  SLED Investigatory File #31-22-0098;
t.  Incident Reports of Bamberg County Detention Center;
u.  Bamberg County Detention Center Inspection Report;
v.  Competency Evaluation of April 13, 2022 of Alan Thibodeau;
w.  Probate Order of April 19, 2022;
x.  Petition for Judicial Admission of April 20, 2022;
y.  Probate Hearing Notice;
z.  Probate Order of May 17, 2022;
aa. Video of Bond Hearing;
bb. Photos of Alan Thibodeau;
cc. Videos of Alan Thibodeau;
dd. BWC 2022-02-14;
ee. Funeral costs;
ff.  Emails from Family to Bamberg, SCDMH, SLED;
gg. Photo-Virtual Bond Hearing;
hh. Nol Pros of Alan Thibodeau dated July 14, 2022;
ii.  Photos 2022-07-17;
jj.  Partial Probate File;
kk. Discovery from Southern Health Partners;
ll.  Minimum Standards for Local Detention Facilities in South Carolina;
mm.     Bamberg SC Contract with Southern Health Partners;
nn. Southern Health Partners Policies and Procedures and Treatment Guidelines;
oo. Employment Contract between Southern Health Partners and Dr. Robert Williams; and
pp. Southern Health Partners Quarterly Reports.

Additionally, it is my understanding that I may be asked to review other documents and depositions as discovery continues. As such, I reserve the right to supplement my opinions herein.

<u>Summary and Factual Overview</u>

Mr. Alan R. Thibodeau was a resident of Virgina and in his early fifties. Mr. Thibodeau suffered from physical and mental ailments. When he was twenty, Mr. Thibodeau was diagnosed with schizophrenia, bipolar type, due to auditory and visual hallucinations along with delusions. He managed his mental health successfully with psychotropic medications for many years. His prescribed medicines included trazodone, an antidepressant used primarily for sleep induction; Depakote® (divalproex sodium), a mood-stabilizer; Haldo|® (haloperidol), an antipsychotic; and

Thorazine® (chlorpromazine), an antipsychotic. Additionally, sometime after his schizophrenia diagnosis, Mr. Thibodeau was diagnosed with diabetes and thereafter required insulin and metformin to control his blood sugar.

In 2021, Mr. Thibodeau became non-compliant with his medications. On January 30, 2022, Mr. Thibodeau self-reported and was admitted to the Behavioral Health Unit at Bon Secours – Southside Medical Center in Petersburg, Virginia. Mr. Thibodeau was discharged from the Bon Secours – Southside Medical Center on February 10, 2022. Shortly after being discharged, Mr. Thibodeau vanished. His family became concerned, and on February 12, 2022, they filed a missing person's report with authorities in Virginia.

On February 14, 2022, Mr. Thibodeau was arrested by the Bamberg County Sheriff's Office ("BCSO") and booked into the Bamberg County Detention Center ("BCDC") after being found sleeping in the spare bedroom of a home in Bamberg, South Carolina. Shortly after his arrest, Mr. Thibodeau appeared for a bond hearing. At that time, with members of his family and advocates from Bon Secours present, the Court ruled that bond would be deferred pending a mental health evaluation.

According to a BCDC "Medical Receiving Screening Form" contained in Mr. Thibodeau's medical chart, he informed correctional staff that he suffered from Type 2 Diabetes and Schizophrenia. On April 13, 2022, the South Carolina Department of Mental Health evaluated Mr. Thibodeau and determined that he lacked capacity to stand trial pursuant to State v. Blair, 275 S.E. 529, 273 S.E. 2d 536 (1981) and S.C. Code Ann. § 44-23-410 (1976). Indeed, Mr. Thibodeau was incapable of actively participating in his psychiatric evaluation with the Department of Mental Health. The evaluator noted, among other things, that Mr. Thibodeau was not able to control himself, was agitated, and spoke in word salad. However, the evaluator further opined that with treatment, Mr. Thibodeau's capacity was likely to be restored in the

foreseeable future. Additionally, the report notes a list of Mr. Thibodeau's prescribed medications and that Mr. Thibodeau takes insulin for his diabetes

On April 19, 2022, the South Carolina Circuit Court for Bamberg County determined that Mr. Thibodeau was "unable to stand trial" because of the South Carolina Department of Mental Health's conclusion that Mr. Thibodeau "likely has untreated symptoms of mental illness." Thereafter, the South Carolina Probate Court for Bamberg County ordered that Mr. Thibodeau be committed to the G. Werber Bryan Psychiatric Hospital due to Mr. Thibodeau lacking "sufficient insight or capacity to make responsible decisions with respect to treatment."

However, Mr. Thibodeau was never transferred to the G. Werber Bryan Psychiatric Hospital.  In fact, following his arrest on February 14, 2022, up to his transfer to the local emergency department on the morning of July 10, 2022, Mr. Thibodeau was housed within BCDC.  Pursuant to a contract executed between Bamberg County and Southern Health Partners ("SHP"), SHP took on the responsibility of providing medical and mental health care to inmates who were detained at BCDC. Specifically, SHP's responsibilities included the provision of "all professional medical, dental, mental health and related health care and administrative services for the inmates, regularly scheduled sick call, nursing care, regular physician care, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, pharmacy services management, administrative support services, and other services."

Despite his obvious deteriorating condition and multiple Court Orders referencing Mr. Thibodeau's untreated, severe medical and mental health conditions, SHP and its medical providers failed to administer any mental health medications. Likewise, despite Mr. Thibodeau's documented diabetes diagnosis, and history of having to control his diabetes with both insulin and metformin, and his obvious need for said medications, SHP and its medical staff failed to

administer any medications during his time within the BCDC.

From February 14, 2022 through July 10, 2022, Mr. Thibodeau's physical and mental health decompensated progressively and in plain view of SHP and BCDC staff. Mr. Thibodeau was housed in isolation, where he reportedly spent the bulk of his time naked and covered in his own excrement. Additionally, Mr. Thibodeau experienced excessive weight loss and life-threatening malnutrition.

On July 10, 2022, Mr. Thibodeau was found unresponsive in his cell. Mr. Thibodeau was transported to the Bamberg-Barnwell Emergency Medical Center where he was found to be in critical condition and suffering from hypothermia, lactic acidosis, and hypoglycemia. When he arrived at Bamberg-Barwell Emergency Medical Center, Mr. Thibodeau weighed a mere 101 pounds.

Mr. Thibodeau was almost immediately transferred to Lexington Medical Center in West Columbia, South Carolina due to the severity of his condition. There, it was discovered that Mr. Thibodeau was experiencing active heart failure, circulatory failure, liver failure, kidney failure, and respiratory failure. Mr. Thibodeau was further found to be suffering from severe dehydration and septic shock.

For the next thirteen days, Mr. Thibodeau received intensive medical treatment. Sadly, Mr. Thibodeau passed away on July 23, 2022. Mr. Thibodeau's autopsy revealed that he had clear signs of emaciation including depletion of adipose tissue stores, serious atrophy of adipose tissue, bitemporal wasting, sunken orbits, hollow cheeks, and a Stage 2 sacral decubitus ulcer. The pathologist concluded that Mr. Thibodeau's cause of death was multisystem organ failure. The manner of death was identified as "undetermined."

<u>Opinions</u>

I have reviewed the records as submitted to me, and based upon my education, training, and experience as set forth above, it is my opinion to a reasonable degree of medical certainty most probably that BCDC and SHP, to include Nurses Geri Gillespie and Karen Hughes, and the SHP Medical Director, Dr. Robert J. Williams, committed the following grossly negligent, willful, and/or reckless acts and/or omissions, which constituted a failure to comply with the appropriate standard of care:

1. In failing to conduct a 14-day medical assessment or additional health assessment of Mr. Thibodeau.

As noted above, the standard of medical care applicable to adult patients in a correctional setting is the same standard of medical care applicable to adult patients reporting to the emergency room from a non-correctional setting. The standard of care requires and compels correctional facilities and their health care providers to conduct an independent 14-day medical assessment of new inmates. The "Health Assessment" policy SHP's Policy and Procedure Manual for Health Services in Jails (found at SHP – Thibodeau 000185) provides in part: "SHP requires patients to receive a complete history and physical exam within fourteen (14) days of commitment at a minimum (or sooner) as required by contract or state regulations. Medical staff performing history and physical exams will be properly trained and authorized to do so under the terms of his/her medical licensure." In short, the policy requires that all new detainees receive a physical examination no later than fourteen days after being booked into BCDC. Not only is a 14-day medical assessment required pursuant to SHP's policies and National Commission on Correctional Healthcare ("NCCHC") guidelines, but it is also mandated by the Minimum Standards for Local Detention Facilities in South Carolina (Section 2056 Health Appraisal). Mr. Thibodeau never received any such fourteen (14) day assessment and SHP's failure to ensure/conduct a proper assessment is part and parcel to their failure to provide adequate care to Mr. Thibodeau.

When circumstances warrant, the standard of care and NCCHC guidelines require and compel correctional facilities and correctional healthcare providers to perform a mental health assessment and evaluation and provide appropriate treatment. Likewise, he "Mental Health" section of SHP's Policy and Procedure Manual for Health Services in Jails (found at SHP-Thibodeau 000187)

provides in part:

> POLICY:
>
> All patients with positive screens for mental health upon intake will receive a mental health evaluation.
>
> PROCEDURE:
>
> The post-admission evaluation will be performed within 14 days of intake. The evaluation will be performed by a trained medical staff member or Qualified Mental Health Professional who is authorized and trained to perform such function.

At the time of his detainment and housing at BCDC, SHP staff was aware that Mr. Thibodeau had a medical history of mental illness. However, the record is devoid of any mental health assessment, counseling, etc., ever being provided, thus demonstrating a failure by SHP to provide adequate treatment during Mr. Thibodeau's detainment. It is my opinion that SHP, by and through its medical staff to include nurses Geri Gillespie and Karen Hughes, and Dr. Robert J. Williams grossly deviated from the standard of care by failing to perform the required 14-day health assessment and the mental health assessment and evaluation of Mr. Thibodeau despite SHP and BCDC staff being notified of prior diagnoses of Type 2 diabetes and schizophrenia.

Further, the standard of care calls for the provision of timely and consistent assessments of inmates who exhibit behavior or conditions warranting close monitoring to determine changes in mental health status and intervention needs. Again, there is no indication in the documents that I have reviewed that there were ever any regular health assessments performed on Mr. Thibodeau. Mr. Thibodeau was clearly in a state of severe mental and physical turmoil. SHP

inexplicably compounded its deviations from the standard of care by failing to perform regular health assessments over the following months. If Mr. Thibodeau refused to comply with the medical assessment / health appraisal, it should have been documented in his medical chart, which it was not. Moreover, pursuant to NCCHC guidelines, one of the key goals of the 14-day medical and mental health assessments is ensuring that mentally ill inmates are identified quickly to prevent diminution in functioning and to ensure treatment is provided expeditiously. If Mr. Thibodeau truly refused or could not participate in his initial assessments, that refusal should have been treated as a mental health emergency necessitating the need for immediate psychiatric evaluation and potentially court ordered medical intervention based on his known medical history of schizophrenia and open mental deterioration as indicated in his initial receiving screening and likely at his bond hearing.

Instead of adhering to or observing the standard of care, applicable policies, procedures, or guidelines and performing routine, necessary assessments of Mr. Thibodeau, SHP and BCDC staff stood by and watched Mr. Thibodeau repeatedly defecate into cereal bowls, smear his feces on his body and throughout his cell, and exhibit other bizarre behavior. It would have been evident to any reasonable person, let alone a medically trained clinician, that Mr. Thibodeau was in the throes of severe mental illness and in need of immediate medical and psychiatric assessment, attention, and treatment.

2. In failing to exercise reasonable or slight care to administer Mr. Thibideau's necessary prescription medications, including Trazadone, Depakote, Thorazine, Lipitor, Atarax, and Humalog along with his diabetes medications.

The standard of care requires correctional facilities and medical practitioners to provide and administer prescription medications when necessary to ensure the wellbeing of inmates and patients. Based on my review of the documents provided to me, SHP medical staff, including but not limited to Karen Hughes, LPN, and Geri Gillespie, LPN, were aware of Mr. Thibodeau's

diagnosis for both schizophrenia and diabetes pursuant to BCDC's "medical receiving screening form." Likewise, if there was any further need for confirmation, SHP and BCDC staff were notified again of Mr. Thibodeau's diagnosis, at the very latest, on or around April 13, 2022 at the time of his Capacity to Stand Trial Evaluation.

Yet, despite this knowledge and Mr. Thibodeau's progressive and prolonged decomposition, SHP and its staff never administered or made available any of Mr. Thibodeau's medications. SHP and its staff, including Nurses Gillespie and Hughes and Dr. Jackson, grossly deviated from the standard of care and acted in callous disregard for the value of human life by failing to provide Mr. Thibodeau with his prescription medications that were necessary both to control his schizophrenia and diabetes.

3. <u>In failing to exercise reasonable or slight care to stabilize Mr. Thibodeau's psychiatric condition when he was noted to be actively psychotic for several months; In failing to exercise reasonable or slight care to intervene when it was known that Mr. Thibodeau was refusing to eat and was obvious that he was experiencing extreme weight loss; In failing to exercise reasonable or slight care to timely transfer Mr. Thibodeau to an emergency department or outside medical facility for advanced medical care in light of his obvious and well-known deteriorating physical and mental conditions; In failing to exercise reasonable or slight care to intervene whatsoever to provide any reasonable treatment for Mr. Thibodeau's declining health.</u>

Based on my experience and training, having reviewed the materials, I find it inconceivable that SHP staff, including Nurses Hughes and Gillespie, and Dr. Jackson took seemingly no measure towards stabilizing Mr. Thibodeau's psychiatric condition. Nurses Hughes and Gillespie's voluntary statements in the SLED file reveal, plainly, that they were highly cognizant of Mr. Thibodeau's mental illness and that for months he was progressively descending into a more and more medically dangerous state of being.

The gist of Nurses Hughes and Gillespie's voluntary statements to SLED reveal that Mr. Thibodeau was somewhat manageable upon arrival at the jail, but his mind rapidly deteriorated. Each report reiterates that Mr. Thibodeau exhibited increasingly bizarre and concerning

behavior, including refusing to wear clothes, mumbling incoherently, smearing feces all over himself and his cell, throwing feces and other bodily fluids, and refusing to shower. Mr. Thibodeau's physical presentation alone would have alerted any reasonably prudent medical provider that Mr. Thibodeau was in dire need of psychiatric treatment and stabilization so as not to be a further danger to himself or others.

SHP and BCDC staff insinuate that Mr. Thibodeau's deterioration and ultimate demise was somehow his family's fault for allegedly not giving them Mr. Thibodeau's medical history. It is the responsibility of the detention center and medical providers to take reasonable action to determine Mr. Thibodeau's medical history. They were aware from the date of his detainment that he suffered from Type 2 Diabetes and Schizophrenia. The escalation of his erratic and bizarre behavior coupled with his obvious severe weight loss alone were more than enough to raise grave concerns.

The standard of care required BCDC and SHP staff to properly assess Mr. Thibodeau's medical condition and to provide care or transfer him if they were incapable of stabilizing or treating Mr. Thibodeau. It was a gross deviation from the standard of care for SHP and BCDC staff to continue to house Mr. Thibodeau in deplorable, septic conditions while simultaneously depriving him of lifesaving medications and treatment.

4. In failing to evaluate Mr. Thibodeau after he was subjected to the utilization of force by correctional staff, including the use of a taser.

It bears mentioning again, the standard of medical care applicable to adult patients coming from a correctional setting is the same standard of medical care applicable to adult patients reporting to the emergency room from a non-correctional setting. The standard of care required SHP and/or BCDC staff to evaluate Mr. Thibodeau after he was subjected to the utilization of force. The SLED file reveals that on March 16, 2022, Mr. Thibodeau was being

transported to Bamberg County Courthouse.  During his transport, an incident transpired wherein a BCSO officer deployed his department issued taser and struck Mr. Thibodeau with an initial 5 second burst.  When Mr. Thibodeau tried to remove the taser probes, he was struck with an additional 5 second burst of electricity. The SLED report indicates that there may have been a second instance where Mr. Thibodeau was tased, though there appears to be no incident report confirming the incident. Additionally, on the body cam footage that was provided to me, a BCDC correctional officer can be heard stating that Mr. Thibodeau was tased "every time we got him out of cell."

Tasers, which send volts of electricity through the human body, can have serious physiological implications and medical repercussions.  Tasers can disrupt brain and heart function, cause cardiac issues, damage other organs, and have the potential to cause death. The probes themselves can cause cuts, bruises, puncture wounds, and damage to tendons and ligaments.

At the very least, Mr. Thibodeau should have been evaluated to ensure that no medical complications were caused by the tasing.  I can find no evidence in the record indicating the Mr. Thibodeau was ever medically evaluated after this incident(s).

5. <u>In failing to exercise reasonable or slight care to prevent and/or treat Mr. Thibodeau's extreme malnutrition with bitemporal wasting; In failing to exercise reasonable or slight care to prevent and/or treat Mr. Thibodeau's dehydration.</u>

Mr. Thibodeau's extreme weight loss and malnutrition would have been apparent to anyone, particularly a reasonably prudent medical practitioner.  Mr. Thibodeau's medical records from Bon Secours indicate that in February 2022, he weighed roughly 140 pounds. Additionally, the video and photographs of Mr. Thibodeau at the time of his detainment and incarceration at BCDC show a well-nourished man of healthy weight. However, the bodycam footage from

officers during the course of Mr. Thibodeau's incarceration over the next several months clearly documents Mr. Thibodeau's rapid and excessive weight loss.

Due to SHP and BCDC's inexcusable failures to properly assess Mr. Thibodeau during his incarceration, the precise extent of Mr. Thibodeau's weight loss was not known until he was admitted into Bamberg County Emergency Department. At that time, Mr. Thibodeau weighed a mere 101 pounds, was clearly emaciated, and almost unrecognizable in comparison to his presentation when booked into BCDC.

The standard of care required SHP and BCDC to ensure Mr. Thibodeau was adequately nourished, hydrated, and to diagnose what was causing Mr. Thibodeau's rapid weight loss and to take appropriate action. It is an indisputable fact, confirmed both by medical records, video and photographic evidence, that Mr. Thibodeau experienced extreme weight loss, emaciation, malnutrition, and dehydration. Given this evidence, I find it exceedingly difficult to believe BCDC and SHP staff's claims that Mr. Thibodeau never refused meals and in fact often requested more food. Even if one were to take those claims as true, that would only compound the need for an in-depth inquiry to confirm what was causing the weight loss. SHP and BCDC's failure to take any action to determine the cause of Mr. Thibodeau's rapid weight loss and treat it accordingly was a gross deviation from the standard of care which compounded with many others and resulted in Mr. Thibodeau's emaciation, malnutrition, multi system organ failure, and ultimate demise.

6. In failing to exercise reasonable or slight care to prevent and/or treat Mr. Thibodeau's decubitus ulcer; In failing to exercise reasonable or slight care to treat Mr. Thibodeau's thrombocytopenia, hypothermia, and hypoglycemia; In failing to exercise reasonable or slight care to treat Mr. Thibodeau's multiorgan failure.

The standard of care required SHP staff to render treatment for Mr. Thibodeau's decubitus ulcer, thrombocytopenia, hypothermia, hypoglycemia and multiorgan failure. If SHP staff was

incapable of providing care for Mr. Thibodeau's physical ailments as they arose, it was incumbent on SHP staff to ensure that Mr. Thibodeau was transferred to a facility with practitioners who were capable of providing adequate treatment. It was a gross deviation from the standard of care to not perform appropriate and necessary medical assessments, which would have alerted staff to Mr. Thibodeau's decubitus ulcer, thrombocytopenia, hypothermia, hypoglycemia and multiorgan failure. Further, it is my opinion that symptoms of many of Mr. Thibodeau's physical ailments, including his decubitus ulcer and hypothermia, would have been readily apparent to any reasonable medical practitioner, without the need for a full medical assessment. SHP staff's failure to recognize and secure treatment for Mr. Thibodeau physical ailments that were brought on during his incarceration was a gross deviation from the applicable standard of care

In sum, it is my opinion that Alan Thibodeau's deterioration, suffering, and death were proximately caused by the Defendants' gross deviations from the standard of care. While all of the above mentioned opinions are indicative and examples of a breach in the standard of care, some of them are much worse. They are willful, conscious decisions made in not affording and administering appropriate, proper and emergent medical care to Mr. Thibodeau. It is my professional opinion that these incidents are not just a single incident of medical negligence but a series of conscious violations of the standard of care and most importantly, written directives, policies and statutes which mandate medical care in circumstances like those that Mr. Thibodeau was in. These gross violations of the standard of care and conscious indifference to Mr. Thibodeau's medical needs proximately caused him to suffer injuries and ultimately caused his death. All of the foregoing opinions are offered to a reasonable degree of medical certainty most probably. I reserve the right to amend or change the above based on new evidence or discovery in this case.

Edward C. O'Bryan, III, MD, MBA, CPE